UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                           CASE NO.

**MONIQUE YVETTE FULLER**                                        **12-10168**
                                                                 SECTION A
DEBTOR                                                           CHAPTER 7

**GATEWAY ONE LENDING AND FINANCE**                              ADVERSARY NO.

PLAINTIFF                                                        **12-1024**

VERSUS

**MONIQUE YVETTE FULLER**

DEFENDANT

## <u>MEMORANDUM OPINION</u>

Trial in the above-captioned adversary proceeding came before the Court on November 16, 2012. The parties agreed to submit depositions in lieu of live testimony and offered agreed exhibits, which the Court admitted into evidence.

### I.     Facts

On November 3, 2010, the debtor, Monique Yvette Fuller ("Fuller"), purchased a 2010 Chevrolet Camaro ("the Camaro") from Steve Rayman Chevrolet in Marietta, Georgia, ("the Dealership") for the total price of $36,824.00 at 10.45% interest over seventy-two months. The Camaro purchase was financed by Gateway One Lending & Finance ("GOLF"). At the time of the purchase, Fuller completed a credit application in which she stated that she earned $73,000 per year as a technical support representative for Verizon. She did not identify any other outstanding loans or creditors on the application. She certified that she was applying for individual credit in her own name and relying on her own income and assets rather than the income or assets of another person as the basis for repayment of the credit requested. She further

certified that she read and agreed to the terms of the application and that the information in it was complete and true.

In addition to receiving the credit application, GOLF ran a credit report on Fuller and conducted a telephone interview as part of its standard loan approval practice.

GOLF's telephone interview with Fuller took place on November 10, 2010, and was contemporaneously memorialized in GOLF's notes.  According to these notes, Fuller told GOLF's representative that she would be the primary driver of the Camaro and she would be making the payments.  Fuller also told the representative that her "cousin Rico Williams" would also be driving the Camaro.

Within months, Fuller defaulted on the loan.[1] When GOLF obtained possession of the Camaro in October 2011, the Camaro had been stripped and was missing its wheels, tires, front seats, engine and transmission.  In December 2011, GOLF received a net payment of $10,050.00 for the sale of the Camaro after marketing fees.  Fuller's deficiency balance is $27,933.01. GOLF seeks to have the deficiency balance declared nondischargeable pursuant to section 523(a)(2).[2]

GOLF investigated Fuller's default and the condition of the Camaro and learned that Fuller purchased six (6) other vehicles at or near the same time all from the same dealership, which Fuller admitted in her deposition.   Fuller had a meeting with Lyle Livesay, who operated a "credit repair" business, because she wanted to improve her credit in order to qualify for a small business loan and open a woman's clothing boutique.  She had previously and unsuccessfully applied for a small business loan and had later learned of Livesay from a

---

[1] Five (5) payments were made.  Only the first payment was made in Fuller's name.  The record is unclear whether she in fact made the payment.

[2] The Complaint also references sections 523(a)(4) (fiduciary debts, embezzlement, and larceny) and 523(a)(6) (willful and malicious injury).  However, only section 523(a)(2) was pursued in the Pretrial Order.

co-worker.  Livesay explained to Fuller that the vehicles would be purchased in her name, using her driver's license, Social Security number and paycheck stubs. Livesay told Fuller that the vehicles would eventually be transferred into Livesay's business' name and actually driven by celebrities or other prominent business people to whom he subleased.[3]  Fuller understood this arrangement.  Within four (4) or five (5) days, Fuller was approved for over $100,000 in credit. Shortly thereafter, Fuller purchased six (6) vehicles over the course of one (1) week from the Dealership.  Fuller did not disclose to anyone at the Dealership her plan with Livesay.  The Camaro was financed by GOLF, but the other vehicles were financed by four (4) different lenders.  She purchased a seventh vehicle for her personal use, but she never had any intention of driving the other six (6) vehicles, including the Camaro financed by GOLF.    Fuller's admitted intention was to transfer the Camaro to Livesay, despite what she stated in her GOLF credit application and to the GOLF representative during the telephone interview.

Fuller's actual income was approximately $41,000 annually, not the $73,000 stated in the credit application.  Also, Rico Williams was Fuller's ex-boyfriend, not her cousin, and he had nothing to do with the purchase of the Camaro.

GOLF's corporate representative, Christopher V. Sellarole ("Sellarole") testified that the credit application contains all of a customer's pertinent information, which is used as a basis to determine loan eligibility.  Had Fuller accurately reported her income on the application, GOLF would not have issued the loan to her because Fuller's debt-to-income ratio would have exceeded GOLF's acceptable standards.   It also was important for GOLF to verify the primary driver and payor for the loan because GOLF was concerned about straw purchases.   Moreover, had GOLF known of the multiple vehicle purchases or the scheme

---

[3] The Camaro was never transferred to Livesay's business.

involving Livesay, it would not have extended credit to Fuller.   Because the multiple purchases took place at or near the same time, it would have been impossible for GOLF to learn of them absent disclosure by Fuller.

Fuller is a graduate of a four-year university with a degree in computer information systems, and she completed a year and a half of school toward a master's degree in business administration.   She testified that she is very familiar with credit applications and the credit process, having previously financed a home in Georgia, two (2) vehicles and student loans.

Fuller filed for bankruptcy relief under chapter 7 on January 19, 2012.   She received a discharge on July 3, 2012.

## II.   Law and Analysis

### A.  Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). A creditor must prove its claim of nondischargeability by a preponderance of the evidence. *In re Mercer*, 246 F.3d 391, 403 (5th Cir.2001). For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance. *Id.*

Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin,* 963 F.2d 809, 813 (5th Cir.1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris,* 70 F.3d 27, 30 n. 12 (5th Cir.1995), citing *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994).

*In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).  Section 523(a)(2)(A) specifically does not apply to "a statement respecting the debtor's … financial condition."

4

### 1. Driver of the Camaro

#### (a) Did Fuller misrepresent who would be driving the Camaro?

On November 10, 2010, during the phone interview, Fuller told GOLF's representative that she would be the primary driver of the Camaro.  Fuller also told the representative that her "cousin Rico Williams" would also be driving the Camaro.  The Court finds that Fuller misrepresented that she would drive the Camaro.

#### (b) Did Fuller know her representation was false?

Fuller testified in her deposition that she never had any intention of driving the Camaro financed by GOLF.  Her admitted intention was to transfer it to Livesay, despite what she stated in her GOLF credit application and to the GOLF representative during the telephone interview.  Fuller testified in her deposition that she intended to transfer the Camaro to Livesay's business, and it would actually be driven by celebrities or other prominent business people.  Therefore, Fuller knew that her representation was false.

#### (c) Was the representation made with intent to deceive GOLF?

Fuller testified that she did not put much thought into whether it was important who was driving the Camaro.

> An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris,* 70 F.3d 27, 30 n. 12 (5th Cir.1995), citing *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994).

*In re Acosta*, 406 at 372.   When asked by GOLF's representative who would be driving the Camaro, she lied and told them that she and Rico Williams would drive it.  Fuller had no

intention of either her or Rico Williams driving the Camaro.[4]  Had GOLF known who really would be driving the Camaro, it would not have funded the loan.  The Court finds that Fuller intentionally deceived GOLF.

### (d) Did GOLF actually and justifiably rely on the misrepresentation?

Sellarole testified that it was important for GOLF to verify the primary driver and payor for the loan because GOLF was concerned about straw purchases.   Moreover, Sellarole testified that had GOLF known of the multiple vehicle purchases or the scheme involving Livesay, it would not have extended credit to Fuller.  Because the multiple purchases took place at or near the same time, it would have been impossible for GOLF to learn of them absent disclosure by Fuller.   Therefore, GOLF actually and justifiably relied on Fuller's misrepresentation.

### (e) Did GOLF sustain loss as a proximate result of reliance?

Fuller defaulted on her loan payments to GOLF.  When GOLF obtained possession of the Camaro in October 2011, the Camaro had been stripped and was missing its wheels, tires, front seats, engine and transmission. In December 2011, GOLF received a net payment of $10,050.00 for the sale of the Camaro after marketing fees.  Fuller's deficiency balance is $27,933.01.  The Court finds that GOLF sustained the loss as a proximate result of reliance on Fuller's misrepresentation.

### 2.  Who Would Pay GOLF

### (a) Did Fuller misrepresent who would pay GOLF?

On the credit application, Fuller certified that she was applying for individual credit in her own name and relying on her own income and assets rather than the income or assets of

---

[4] Fuller also misrepresented her relationship with Mr. Williams.

another person as the basis for repayment of the credit requested.  She further certified that she

read and agreed to the terms of the application and that the information in it was complete and

true.  However, Fuller admitted in her deposition that she never intended to pay GOLF, and she

expected Livesay to make the payments.  Therefore, Fuller misrepresented who would pay

GOLF.

### (b) Did Fuller know her representation was false?

Fuller admitted that she had no intention of making payments on the loan.  Therefore, she

knew her representation was false.

### (c) Was the representation made with the intent to deceive?

Fuller is an educated person who is familiar with the credit process.   She purposely lied

to GOLF in a scheme to boost her credit rating.   The Court finds that Fuller intended to deceive

GOLF.

### (d) Did GOLF actually and justifiably rely on the misrepresentation?

GOLF's representative testified that it would not have made the loan if Fuller would have

disclosed the scheme with Livesay and that Fuller was relying on Livesay to make the payments.

> Justifiable reliance is gauged by "'an individual standard of the plaintiff's own
> capacity and the knowledge which he has, or which may fairly be charged against
> him from the facts within his observation in the light of his individual case.'" *In
> re Vann,* 67 F.3d 277, 283 [(11th Cir. 1995)] (quoting *Prosser & Keaton on Torts*
> at 751). "'It is only where, under the circumstances, the facts should be apparent
> to one of the plaintiff's knowledge and intelligence from a cursory glance, or he
> has discovered something which should serve as a warning that he is being
> deceived, that he is required to make an investigation on his own.'" *Id.* at 283
> (quoting *Prosser & Keaton on Torts* at 752).

*In re Touchet*, 394 B.R. 418, 423-424 (Bankr.M.D.La. 2008).

GOLF had no reason to suspect that Fuller was being dishonest.  Therefore, it had no duty investigate further, and the Court finds that GOLF actually and justifiably relied on Fuller's misrepresentation.

### (e)  Did GOLF sustain loss as a proximate result of reliance?

Fuller defaulted on her loan payments to GOLF.  When GOLF obtained possession of the Camaro in October 2011, the Camaro had been stripped and was missing its wheels, tires, front seats, engine and transmission.  In December 2011, GOLF received a net payment of $10,050.00 for the sale of the Camaro after payment of marketing fees. Fuller's deficiency balance is $27,933.01.  The Court finds that GOLF sustained the loss as a proximate result of reliance on Fuller's misrepresentation.

### B.  Section 523(a)(2)(B)

GOLF also alleged that the debt is nondischargeable pursuant to section 523(a)(2)(B). Section 523(a)(2)(B) excepts from discharge debts " for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--"

> (B) use of a statement in writing--
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive...

### 1.  Income

### (a) Use of a statement in writing respecting Fuller's financial condition that is materially false

Fuller admitted that she stated on the credit application that her income was $73,000. However, she testified at her deposition that she made approximately $41,000 annually. Therefore, Fuller's credit application was materially false.

8

**(b) Did GOLF reasonably rely on the misrepresentation?**

GOLF's corporate representative, Sellarole testified that the credit application contains all of a customer's pertinent information, which is used as a basis to determine loan eligibility. Sellarole further testified that had Fuller accurately reported her income on the application, GOLF would not have issued the loan to her because Fuller's debt-to-income ratio would have exceeded GOLF's acceptable standards. Therefore, GOLF actually relied on Fuller's misrepresentation of income.

Was GOLF's reliance on Fuller's statement of her income reasonable? "Whether a creditor's reliance is reasonable is to be determined from the totality of the circumstances." *Matter of Young*, 995 F.2d 547, 549 (5th Cir. 1993).

> The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Matter of Coston*, 991 F.2d 257, 262 (5th Cir. 1993) (citations omitted).

While there was no relationship of trust between Fuller and GOLF, there were also no "red flags" that would have alerted GOLF to Fuller's dishonesty. Was it reasonable for GOLF to rely on Fuller's statement of her income without verifying it?

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.
>
> A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other

> factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*In re Cohn*, 54 F.3d 1108, 1117 (3rd Cir. 1995) (citations omitted).   GOLF's did not submit any evidence as to the practice in the industry or its standards.   Therefore, GOLF did not meet its burden of proving that its reliance on the Fuller's statement of income was reasonable.

### (c) Did Fuller make the credit application with the intent to deceive?

"[F]or a debt to be nondischargeable under section 523(a)(2)(B), the debtor must have intentionally deceived the creditor." *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992).

At the time of the purchase, Fuller completed a credit application in which she stated that she earned $73,000 per year as a technical support representative for Verizon.  She certified that she read and agreed to the terms of the application and that the information in it was complete and true.

> A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. Factors to consider include if the debtor was intelligent and experienced in financial matters, and if there was a clear pattern of purposeful conduct. "Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent."

*Id.* (citations omitted).

The Court finds that Fuller intended to deceive GOLF in furtherance of her scheme with Livesay.

10

### III.      Conclusion

Because GOLF did not prove that its reliance on Fuller's stated income was reasonable, it has not met its burden of proving nondischargeability pursuant to section 523(a)(2)(B). However, GOLF met is burden of proving nondischargeability pursuant to section 523(a)(2)(A). Therefore, the deficiency balance of $27,933.01 owed GOLF by Fuller is nondischargeable.   A separate Judgment will be entered in accord with this ruling.

New Orleans, Louisiana, November 29, 2012.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge